[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14944

_____

D.C. Docket No. 0:05-cv-61534-JEM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 27, 2012
JOHN LEY
CLERK

DENNIS SOCHOR,

Petitioner - Appellant,

versus

SECRETARY DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 27, 2012)

Before TJOFLAT, MARCUS and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

The main issue in this appeal concerns whether the Supreme Court of Florida unreasonably applied clearly established federal law when it explicitly refused to consider relevant mental health evidence in its collateral review of a sentence of death. Dennis Sochor, a serial rapist sentenced to death after he confessed to the murder and kidnapping of an eighteen-year-old woman, argues that the ruling of the Supreme Court of Florida that the failure of his trial counsel to present mitigating mental health evidence during the penalty phase of his trial did not prejudice him was an unreasonable application of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). Florida responds that the Supreme Court of Florida reasonably applied Strickland and, if not, Sochor, alternatively, cannot establish that he was prejudiced by his lawyer's deficient performance. Although Porter v. McCollum (Porter II), 558 U.S. ----, 130 S. Ct. 447 (2009), makes clear that the Supreme Court of Florida unreasonably applied Strickland, our de novo review of the record establishes that there is no reasonable probability that the trial court would have imposed a  sentence other than death had Sochor's trial counsel not been deficient. Sochor also makes two other arguments: (1) that Florida violated his right to due process under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it allegedly failed to disclose that his brother had received immunity in exchange for his testimony against

2

Sochor; and (2) that Florida violated his right to due process under <u>Giglio v. United States</u>, 405 U.S. 150, 92 S. Ct. 763 (1972), when it allegedly failed to disclose that it had granted his brother immunity and had instructed his brother to testify untruthfully that he had not kissed the victim on the night of the murder. But Sochor fails to offer clear and convincing evidence that the contrary findings of the Supreme Court of Florida are unreasonable. We affirm the denial of Sochor's petition for a writ of habeas corpus.

## I. BACKGROUND

Dennis Sochor wanted to have sex, and when eighteen-year old Patty Gifford refused him, Sochor choked her to death with his bare hands. Sochor dumped Patty's body by the side of a road and drove home to his apartment. At trial, the jury heard these facts from the tape-recorded confessions of Patty's murderer, Dennis Sochor.

Sochor lived in Fort Lauderdale, Florida, in 1981. Sochor's brother, Gary, traveled from Michigan to Fort Lauderdale on the day after Christmas to visit him. At 6 p.m. on New Year's Eve, the brothers drove a truck from Sochor's apartment to a lounge called the Banana Boat.

Patty and her boyfriend also lived in Fort Lauderdale in 1981. Patty's boyfriend had to work on New Year's Eve so Patty and her friend, Delta Harville,

3

decided to celebrate together. Their friend, Patricia Boreman, tended bar at the Banana Boat. They drove Delta's car to the lounge at 9 p.m.

Patty and Delta sat at a tiki bar behind the Banana Boat. As they sat there, Boreman served Delta a few drinks. Sochor and his brother approached Patty and Delta and tried to talk with them. Sochor sat at the bar and talked with the women for a few hours. Someone took a photograph of Sochor sitting next to the women.

Delta had too much to drink. Patty, Sochor, and Gary took Delta to the parking lot and put her in her car. Patty then returned to the Banana Boat to pay her bar tab. When Patty came back to the parking lot, she determined that Delta was unable to drive. Sochor and his brother asked Patty if she wanted to accompany them in the truck to find something to eat while Delta slept in her car. Tragically, Patty accepted their invitation.

Sochor and Gary did not take Patty anywhere to eat. In a tape-recorded confession to the police that the prosecution played for the jury, Sochor stated that he and Patty had an argument. Sochor asked Patty if she wanted to have sex, and Patty said no. When Sochor grabbed Patty by the hair, she fought for her life. Patty screamed and scratched Sochor's face. Sochor "got angry and began choking her." When Patty stopped breathing, Sochor knew that he had "probably just murdered her." After Sochor murdered Patty, he drove the truck down a dirt

4

road "and placed her body in the weeds."

Gary testified against his brother. Gary stated that, after they left the Banana Boat, the truck came to a stop and Sochor stepped out of it. Gary stated that he heard "Patty . . . hollaring [sic] for help, asking what was going on." Gary testified that he "got out of the passenger's side, ran around the vehicle, and [saw that Sochor] had [Patty] on the ground, had [Patty's] hands pinned down." Gary threw a rock at Sochor and "hollared [sic] at [Sochor] to leave her alone," but Sochor "told [him] to get back in the truck." Gary did as he was told because he was scared of his brother. Gary testified that he never saw Patty again.

A local television station produced a news report about Patty's disappearance. As Sochor watched the report, the photograph of Sochor sitting with Patty at the tiki bar behind the Banana Boat appeared on the television screen. When Sochor saw the photograph, he "estimate[d] that [he] had, in fact, committed another rape and was terrified of the fact, so [he] decided to leave town."

Sochor fled Fort Lauderdale in the truck. He drove to Tampa, Florida, where he dumped the truck, and then traveled by bus to New Orleans, Louisiana. He eventually moved to Atlanta, Georgia. Police officers later arrested Sochor in Georgia.

When officers from Fort Lauderdale interviewed Sochor in Atlanta about Patty's disappearance, Sochor confessed, but stated that his memory of that New Year's Eve was foggy. The officers recorded the confession by audio tape. The officers transported Sochor to Fort Lauderdale and drove him to the Banana Boat. Again, Sochor made a tape-recorded confession, but this time he provided more details about the murder. The officers tried to locate Patty's body, but Sochor did not remember its exact location. Sochor made one more recorded confession. At trial, the jury heard all three confessions.

Sochor's roommate in Atlanta, Paul Jones, testified at trial. Jones stated that Sochor once "told [Jones] of a time that he had choked someone, and how [Sochor had] disposed of the body . . . [o]ut in the countryside, a drainage pipe." Jones testified that Sochor told him that "[i]f he had to, he would do it again." Sochor told Jones that the murder "didn't bother him at all" and that "women were more or less a sexual tool, nothing more."

An inmate that Sochor met when he was incarcerated in the Broward County jail in 1987 named Michael Hickey testified at trial. Hickey stated that Sochor approached him and asked whether he "knew different methods of discrediting a witness." Hickey testified that "at the end of the conversation, [Hickey] was telling [Sochor] how to discredit his brother, then [Sochor] said to

6

[Hickey], 'Yeah, in case your [sic] wondering, I killed a fucking, slut, bitch[.]"

Dr. Arnold Zager, a psychiatrist, interviewed Sochor and testified for the defense at trial. Dr. Zager testified that Sochor had a "long-standing problem of drug and alcohol abuse," and he suspected that Sochor suffered from "anti-social personality disorder." Dr. Zager stated that Sochor was "a much more aggressive, potentially very violent, individual under the influence of intoxicants." Dr. Zager testified that Sochor told him that he had an alcoholic blackout on the night of the murder, and Dr. Zager believed that alcohol affected Sochor that night: "[I]t was my impression that this gentleman, if indeed he committed the crime, and was stopped in the act, and when asked is it wrong or is it against the law to commit such a crime, that individual might say certainly it is, but in a sense, disregard it." Although Dr. Zager did not believe Sochor met the requirements for involuntary commitment under Florida law, Dr. Zager believed that Sochor was "extremely dangerous to the public."

Dr. Patsy Ceros-Livingston, a clinical psychologist, also interviewed Sochor and testified for the defense at trial. She testified that Sochor reported a long-term history of drug and alcohol abuse, starting at a very young age. She stated that Sochor told her that the Army recommended that he get psychiatric care when it discharged him. She also stated that Sochor told her that he had attempted to

7

commit suicide by drowning. Dr. Ceros-Livingston testified that she administered two psychological tests to Sochor. The test results suggested that Sochor suffered from alcohol and drug abuse, that Sochor might have a quick temper, that he might engage in impulsive and destructive behavior, and that Sochor was attempting to "make [himself] look psychopathological." Dr. Ceros-Livingston stated that Sochor may have been "malingering."

Dr. Ricardo Castillo, a psychiatrist, testified for the state of Florida at trial. Dr. Castillo testified that Sochor was being medicated with lithium, which Dr. Castillo described as a medicine used mostly to treat manic depressive illness. Dr. Castillo described manic depression as a condition that affected mood and behavior, but he testified that he did not believe that Sochor suffered from that condition. Dr. Castillo stated that he did not believe that Sochor blacked out the night of the murder. He stated that Sochor had a "a type of selective amnesia" and an antisocial personality disorder.

After the jury convicted Sochor of kidnapping and first-degree murder, the prosecution presented damaging evidence during the penalty phase that Sochor was a serial rapist. Captain Mark Schlein of the Broward County sheriff's department testified that Sochor confessed to raping two women on different occasions before he murdered Patty. Captain Schlein testified that one of the rapes

8

occurred in August 1979 near Pontiac, Michigan. Captain Schlein stated that Sochor had "met a young lady at a bar, and engaged her in conversation, [and] asked if she would be nice enough to drive him home." The victim agreed. Sochor began to "embrace and kiss" the victim but "[s]he resisted." Sochor "choked [the victim] to unconsciousness." When the victim woke, Sochor was raping her. The victim "was nude" and "had deficated [sic] in the car and on herself." After Sochor raped the victim in the car, he took her to his house. Sochor "allowed [the victim] to take a shower" before he "raped [her] two more times" and "forced [her] to commit an oral sex act." Detective Vicki Russo testified that one night in 1980 Sochor snuck up behind a nineteen-year old "very petite" girl in a parking lot in Fort Lauderdale and choked her. Sochor "forced [the victim] in the car, and . . . threatened to cut her, stab her." Sochor told the victim that if she resisted "[h]e would kill her. He would stab her, choke her." Sochor drove the car into a "warehouse area, up to a camper shell that goes on the back of a truck." Sochor forced the victim into the camper shell and "ripped her clothes off." Detective Russo testified that Sochor "sexually assaulted [the victim] vaginally, anally, orally, and then kept repeating this." Sochor "became very angry with [the victim] that he hadn't climaxed and threatened that he would cut her breasts." As he violated the victim, Sochor "told her that [her breasts] were

9

too small, and he bit her very, very hard on the breast repeatedly, and also on the vaginal area." The victim told Detective Russo that when Sochor bit her "it wasn't so much out of sexual lust, it was out of violence. [Sochor] was trying to hurt [the victim] because he was angry that he was not able to climax with her." Sochor was arrested for sexual battery and kidnapping, and he pled guilty to sexual battery. Sochor's ex-wife also testified for the prosecution that Sochor had "assaulted" her "at the least, thirty times [one] year." Sochor's ex-wife testified that "[i]f [Sochor] wanted sex, he got it because he would get violent, if he didn't get it."

The prosecution also presented evidence about the cruelty of Sochor's crime. The prosecution called Dr. Ronald Wright, the chief medical examiner of Broward County. Dr. Wright testified that choking is a slow and painful way to die.

In support of mitigation, Sochor's lawyer called several witnesses to testify about Sochor's troubled childhood and difficulties in adulthood. Sochor's brother, Gary, testified that his "whole childhood was memories of nothing but getting beat" by his parents, and that Sochor "took a lot of . . . beatings" that were intended for Gary. Gary testified that he "remember[ed] my mother, when [his] dad would get home, yelling at my dad to spank us for this or for that, and he

10

would start in with the belt, I mean a big belt, and just beat, beat, beat." Sochor's sister, Cathy Cooper, testified that Sochor "had a pretty rough life" and that all of their parents' "frustrations and everything got taken out on" Sochor. Cooper stated that their father "used to be a boxer," "knew how to hit," and had a "very quick and violent temper." Cooper testified that "[t]here were times where literally you'd have to pull [her father] off of" Sochor. Sochor's father "constantly hit [Sochor] with his fist. He'd hit him in the face, in the arms, and . . . would just be in a rage, anyplace he could hit him." Cooper testified that Sochor "constantly had his lips split open, black eyes, bruises all over his body." Cooper stated that she "remember[ed] very clearly that [her] dad had [Sochor] down on the floor and was strattled over the top of him and just, you know, like plummeting with his fist." Sochor's father "got ahold of [Sochor's] hair, and he kept banging his head against the wall." Sochor "just sort of slid to the floor, and then dad just started kicking him."

Sochor's parents testified during the penalty phase that Sochor suffered hardship during childhood and that they beat him. Sochor's father, Charles Sochor, testified that he and his wife, Rose, had ten children, and because Sochor was the oldest boy, he "always put more responsibilities on [Sochor] than he should have had [sic]." Charles Sochor testified that he had worked in an

11

automobile plant at night and at a lumber mill during the day. Once Charles returned home from work and Sochor's mother, Rose, told Charles that "she had lost her temper and beat [Sochor], then banged his head against the wall." Sometimes when Charles returned from work and was "informed of the things the boys had done, [he] would lose [his] temper and beat them, [Sochor] always getting the worst of it." Charles stated that when Sochor was four-years old, Sochor fell as he ran with a tin horn in his mouth. Charles testified that the tin horn went through the roof of Sochor's mouth and "open[ed] a hole that you could see right into his head." Charles stated that Sochor was different after he was released from the Army. He testified that Sochor "was violent, especially when alcohol was involved. He was completely out of control." Charles testified that he and Rose realized that Sochor "needed mental help," and that they tried "to get [Sochor] institutionalized." Charles stated that, after they convinced a judge to commit Sochor to a mental hospital, Sochor was released after "less than a week." Sochor was angry that his parents had him committed. Charles testified that he spoke to Sochor one time after the commitment. He talked with Sochor on the telephone and Sochor told him that he had attempted to commit suicide.

Sochor's mother, Rose, testified that Sochor had a "difficult childhood" and that she was an "abusive mother." Rose stated that Sochor had "a lot of hostility

12

and problems" as he got older and things became worse after Sochor was discharged from the Army, especially when he drank alcohol. Rose Sochor also testified that she and her husband, Charles, once attempted to have Sochor treated for mental illness, but they were told by medical professionals that, although Sochor "definitely needed psychiatric help, [he] was not severe enough" to be hospitalized indefinitely.

Sochor's lawyer introduced the reports of the three mental health experts who had evaluated Sochor and had testified during the guilt phase: Dr. Zager, Dr. Ceros-Livingston, and Dr. Castillo. Sochor's lawyer had not provided any background materials to these experts. Their evaluations were based entirely on information gathered from their interviews with Sochor. Sochor's lawyer did not instruct his experts to conduct their evaluations for the purpose of producing evidence of mitigating circumstances. They conducted their evaluations to determine Sochor's competency to stand trial and his sanity at the time of the crime. All of the experts testified that Sochor was competent to stand trial and was sane when he kidnapped and murdered Patty Gifford.

After the jury recommended a sentence of death by a vote of 10 to 2, the trial court found four statutory aggravating circumstances and sentenced Sochor to death. The trial court found that Sochor was previously convicted of a felony

13

involving the use or threat of violence for his conviction involving the sexual assault he committed in Fort Lauderdale in 1980. The trial court found that the killing of Patty was committed while Sochor was engaged in the commission of the felony of kidnapping because there was "sufficient evidence to prove the victim was taken from the Banana Boat and, at some point, held against her will." The trial court found that the killing was especially heinous, atrocious, or cruel because Patty was forcibly removed from the truck, begged for her life, suffered a slow and painful death by asphyxiation, and clearly suffered fear and emotional distress before she died. The trial court also found that the killing was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court found no statutory or nonstatutory mitigating circumstances, but it gave some weight to Sochor's troubled childhood.

On direct appeal, the Supreme Court of Florida ruled that there was insufficient evidence to establish the "cold, calculated, and premeditated" aggravating circumstance, but the court affirmed the convictions and sentence of death. Sochor v. State (Sochor I), 580 So. 2d 595 (Fla. 1991). The Supreme Court of the United States granted certiorari, vacated the sentence, and remanded to the Supreme Court of Florida to reconsider the error about the unproved aggravating circumstance. Sochor v. Florida (Sochor II), 504 U.S. 527, 112 S. Ct. 2114

14

(1992). On remand, the Supreme Court of Florida ruled that the trial court committed harmless error when it weighed the unproved aggravating circumstance. Sochor v. State (Sochor III), 619 So. 2d 285 (Fla. 1993). The Supreme Court of Florida affirmed Sochor's sentence of death.

Sochor filed, under Florida Rule of Criminal Procedure 3.850, a motion in a Florida court in which he asserted three claims relevant to this appeal. First, Sochor argued that his trial lawyer had rendered ineffective assistance during the penalty phase by failing to adequately investigate and present relevant mitigation evidence. Second, Sochor maintained that the prosecution violated his right to due process, see Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it allegedly failed to disclose that Gary had received immunity in exchange for his testimony. Third, Sochor asserted that the state violated his right to due process, see Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), when it allegedly failed to disclose that it had granted Gary immunity and had instructed him to testify untruthfully that he had not kissed Patty on the night of the murder.

The trial court held an evidentiary hearing. Sochor presented lay witness testimony and expert witness testimony in support of his claims of ineffective assistance of counsel, and the state offered its own expert testimony. To support his Brady and Giglio claims, Sochor offered the testimony of his brother, Gary,

15

and the state presented the testimony of Kelly Hancock, the assistant district attorney who prosecuted the case.

Sochor presented testimony regarding the physical abuse and injuries he suffered as a child. Sochor's brother, Blaine Sochor, and sister, Kathy Cooper, both testified that their father had brutally beaten Sochor when he was a child. Kathy Cooper testified that their father usually beat one of the children when he came home from work and that Sochor was his favorite target. Kathy Cooper also testified that her father sexually abused her when she was a child. The father, Charles Sochor, testified that he beat Sochor when he was a child, and this testimony was corroborated by Sochor's mother and others.

Sochor also presented testimony that he endured poverty as a child, suffered head trauma as a young man, and frequently abused alcohol and drugs. Earl Mitchell, one of Sochor's high school friends, testified that Sochor once got into a fight with a much larger man. The man picked Sochor up, threw him to the ground, and slammed his head into the pavement. Mitchell also testified that he and Sochor "dropped acid" over one hundred and fifty times in 1971. Marvin Droste, one of Sochor's childhood friends, testified that Sochor's childhood home was "disheveled" and "unkempt." He also testified that Sochor's family was poor. Sochor's brother, Blaine, testified that he and his siblings would sometimes be so

16

hungry as children that they would hunt for food. Blaine also testified that he suffered from boils on his legs as a child and he attributed this condition to malnutrition.

Sochor also presented lay witness testimony that he had positive character traits. Numerous siblings and friends of Sochor testified that he was protective and loving. Sochor's father testified that Sochor once convinced him not to commit suicide.

Two mental health experts testified for Sochor at the evidentiary hearing. Neither expert had testified at trial. Dr. Richard Greer, a psychiatrist, testified that he evaluated Sochor in April 1999. Dr. Greer diagnosed Sochor with manic depression and determined that he had a history of drug and alcohol abuse. Dr. Greer based his diagnosis of manic depression on his evaluation of Sochor, Sochor's medical and prison records, and the fact that Sochor had been prescribed Lithium in the past. Dr. Greer stated that Sochor's"religiosity," which Dr. Greer observed both in records near the time of trial and in his interview with Sochor, was a "classic" symptom of manic depression.

Dr. Greer testified that Sochor's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the offense and that the combination of Sochor's manic depression and his alcohol consumption at

the time of the offense created a "synergistic effect," greater than the individual components. Dr. Greer also testified that Sochor was under extreme mental and emotional disturbance at the time of the crime. Dr. Greer stated that the "synergistic effect" of Sochor's alcohol consumption on his manic depression was enhanced on the night of the murder because he had abstained from alcohol for a long period of time before that night. Dr. Greer stated that even a small amount of alcohol would have had a significant effect on Sochor's mental illness.

Dr. Karen Froming, a neuropsychologist who examined Mr. Sochor in 1996, also testified for Sochor. Dr. Froming testified that she reviewed background materials, interviewed Sochor's family members, and conducted a battery of psychological tests on Sochor. Dr. Froming diagnosed Sochor with organic brain damage and manic depression. Dr. Froming testified that the injuries that Sochor suffered as a child and a young man could have caused an injury to Sochor's brain and that Sochor's extensive alcohol consumption increased his risk of organic brain damage. Dr. Froming testified that the combination of Sochor's mental disorders coupled with his consumption of alcohol would have caused Sochor to have "no self control whatsoever" on the night of the murder.

Dr. Froming testified that Sochor suffered from extreme mental and emotional disturbance when he murdered Patty. She also stated that Sochor's

18

ability to conform his conduct according to the law was substantially impaired at the time of the murder. Dr. Froming testified that, because Sochor had abstained from alcohol before the night of the murder, a small number of alcoholic drinks could have caused him to become acutely intoxicated and black out: "[H]is impulse control would have been substantially reduced, as I said before to the point of nonexistence. So it would have been instantaneous action that would of [sic] occurred with the possibility of thinking only after it happened."

Dr. Ceros-Livingston, the psychologist who evaluated Sochor and testified for the defense during the guilt phase of the trial, testified for the state at the evidentiary hearing. Dr. Ceros-Livingston testified that she had reviewed the background materials that Sochor's postconviction counsel had provided to Dr. Greer and Dr. Froming. Dr. Ceros-Livingston testified that the background materials did not affect her original diagnosis. She stated that the background materials did not establish that Sochor suffered from manic depression or organic brain damage, and that Sochor's ability to sit still and concentrate during the eight-hour examination that Dr. Froming conducted was inconsistent with manic depression. She also disputed the significance of notations in the prison records that Sochor had been prescribed lithium. Dr. Ceros-Livingston testified that the background materials did not contain symptoms of manic depression. Dr. Ceros-

19

Livingston testified that the background materials did not establish that Sochor was in a manic phase at the time of the murder.

Sochor also presented evidence in support of his claims that the state violated his right to due process. Gary testified at the evidentiary hearing that the police officer who escorted him into the courtroom during the trial told him that he had been given immunity. Kelly Hancock, the prosecutor at Sochor's trial, testified that he never offered Gary immunity and that police officers in Florida do not have the power to grant witnesses immunity. Gary also testified at the evidentiary hearing that Hancock told him not to mention in his testimony that he kissed and fondled Patty on the night of the murder. Hancock, on the other hand, testified that Gary Sochor never told him that he had kissed and fondled Patty on the night of the murder.

The trial court denied Sochor's claims. With respect to the Sochor's claim of ineffective assistance, the trial court concluded that the additional background evidence that Sochor produced during the evidentiary hearing was either cumulative of the background evidence presented during the penalty phase or irrelevant. With respect to Sochor's Brady and Giglio claims, the trial court found that Gary's testimony that he was granted immunity and that the state instructed him to lie about kissing Patty was not credible. The Supreme Court of Florida

20

affirmed in 2004.  Sochor v. State (Sochor IV), 883 So. 2d 766 (2004).

The Supreme Court of Florida ruled that Sochor's lawyer rendered deficient performance when he failed to investigate mental health evidence, but the court also ruled that Sochor did not suffer prejudice as a result of the deficient performance.   The Supreme Court of Florida acknowledged that the trial court did not consider the testimony of Dr. Greer and Dr. Froming when the trial court ruled that Sochor's lawyer did not render ineffective assistance, and the court stated that this approach was consistent with Florida law, id. at 783–84.  Quoting extensively from its decision in Porter v. State (Porter I), 788 So. 2d 917, 923 (2001), overruled by Porter II, 558 U.S. ----, 130 S. Ct. 447 (2009), the Supreme Court of Florida explained that "[a]t the conclusion of the postconviction evidentiary hearing in this case, the trial court had before it two conflicting expert opinions over the existence of mitigation. . . .  Based upon [the] case law [of the court], it was then for the trial court to resolve the conflict by the weight the trial court afforded one expert's opinion as compared to the other."  Sochor IV, 883 So. 2d at 783 (citation and internal quotation marks omitted).   Approving the analysis that the trial court employed, the Supreme Court of Florida stated that the trial court "resolved the conflict by determining that the greatest weight was to be afforded to the State's expert.  We accept this finding by the trial court because it was based upon

21

competent substantial evidence." Id.

In deciding this issue, the Supreme Court of Florida explicitly recognized that it "faced . . . a situation like the one [it was] faced with in" Porter I. Sochor IV, 888 So. 2d 782. In Porter I, a jury in Florida convicted Porter of two counts of first degree murder after he killed his ex-girlfriend and her boyfriend. Porter II, 558 U.S. at ----, 130 S. Ct. at 448. The jury at Porter's trial recommended a sentence of death for both murders, but the trial court imposed a sentence of death for only the murder of the ex-girlfriend. Id. at 449. Porter filed a petition for postconviction relief in state court on the ground that his penalty-phase counsel had failed to investigate and present mitigating evidence. Id. The trial court conducted an evidentiary hearing, and Porter presented extensive mitigating evidence, all of which was apparently unknown to his penalty-phase counsel. Id. Relevant to this appeal, Porter presented an expert in neuropsychology who had examined Porter and administered psychological tests to him. Id. at 451. Porter's neuropsychologist testified that Porter suffered from brain damage that could manifest in impulsive, violent behavior. Id. Porter's neuropsychologist testified that, at the time of the murders, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance, two statutory mitigating circumstances. Id. Porter's

22

neuropsychologist also testified that Porter had substantial difficulties with reading, writing, and memory, and that these cognitive defects were present when he was evaluated for competency to stand trial. Although the experts that the state presented reached different conclusions regarding the statutory mitigators, each expert testified that he could not diagnose Porter or rule out a brain abnormality. Id. The trial court ruled that Porter had not been prejudiced by the failure to introduce any of the mental health mitigation evidence. Id. The trial court found that Porter had failed to establish any statutory mitigating circumstances, and that the nonstatutory mitigating evidence would not have made a difference in the outcome of the case. The Supreme Court of Florida affirmed. Id. It accepted the finding of the trial court that Porter could not have established any statutory mitigating circumstances, based on the fact that the trial court had accepted the conclusions that the experts for the state offered regarding the existence of such circumstances. The Supreme Court of Florida stated that Porter's expert testified that Porter "suffered from a mental condition that substantially impaired his ability to comply with the law," Porter I, So. 2d at 923, and the same thing occurred at Sochor's evidentiary hearing, Sochor IV, 883 So. 2d at 783 n.19. The Supreme Court of Florida stated that "[t]he State's expert disagreed [with the conclusions of Porter's expert] and testified that 'this mitigation was not present,'" and "[w]e

23

noted that the [trial] court 'reject[ed] [the] testimony [of Porter's expert], and rather accepted the testimony of the [expert of the state] (who specifically disagreed with [Porter's expert]), on this issue." Id. (some alterations in original).  Relying on Porter I, the Supreme Court of Florida in Sochor IV deferred to the decision of the trial court not to credit the testimony of Dr. Greer and Dr. Froming because their testimony was controverted by Dr. Ceros-Livinston, the expert for the state. Sochor IV, 883 So. 2d at 783–84.  Leaving no doubt that it failed to consider the testimony of Dr. Greer and Dr. Froming when assessing whether Sochor suffered prejudice, the Supreme Court of Florida stated that, "[a]s in Porter [I] . . . we find that the circuit court's decision to credit the testimony of the State's mental health expert over the testimony of Sochor's new experts is supported by competent, substantial evidence." Id.

Five years after the Supreme Court of Florida decided Sochor IV, the Supreme Court of the United States repudiated its approach.  Porter II, 558 U.S. at ----, 130 S. Ct. at 454.  Before the Supreme Court decided Porter II, Sochor filed a petition for a writ of habeas corpus in the district court, and the district court denied the petition.  Sochor v. Sec'y, Fla. Dept. of Corr. (Sochor V)., 05-61534-CIV-MARTINEZ (S.D. Fla. Sept. 23, 2009).

## II. STANDARD OF REVIEW

24

The Antiterrorism and Effective Death Penalty Act of 1996 governs Sochor's petition and our review of the decision of the Supreme Court of Florida. 28 U.S.C. § 2254(d). We will not disturb the decision of the state court unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "The Supreme Court of the United States has held that § 2254(d)(1) imposes a 'highly deferential standard for evaluating state-court rulings,' a standard 'which demands that state-court decisions be given the benefit of the doubt.'" Rutherford v. Crosby, 385 F.3d 1300, 1306–07 (11th Cir. 2004) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002)). "A state court decision involves an unreasonable application of federal law when it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case," Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1178 (11th Cir. 2010) (internal quotation marks omitted), or when it "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context," Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

To determine whether the state court unreasonably applied clearly established federal law in adjudicating Sochor's habeas petition, this Court must conduct the two-step analysis that the Supreme Court set forth in Harrington v. Richter, --- U.S. ----, 131 S. Ct. 770 (2011). First, this Court "must determine what arguments or theories supported or, [if none were stated], could have supported the state court's decision." Johnson v. Sec., Dept. of Corr., 643 F.3d 907, 910 (11th Cir. 2011) (quoting Harrington, --- U.S. ----, 131 S. Ct. at 786.) (alteration in original) (internal quotation marks omitted). Second, this Court "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. (alteration in original) (internal quotation marks omitted). In other words, we may issue a writ of habeas corpus only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with . . . precedents" of the Supreme Court of the United States. Harrington, --- U.S. ----, 131 S. Ct. at 786.

"The question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." Rice v. Collins, 546 U.S. 333, 342, 126 S. Ct. 969, 976 (2006). "Our review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." Stephens v. Hall, 407 F.3d 1195, 1201 (11th Cir. 2005). We presume

26

findings of fact to be correct, and Sochor bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

We divide our discussion into two parts. First, we address Sochor's claim that he was prejudiced by his lawyer's deficient investigation and presentation of mitigating evidence during the penalty phase of his trial. Second, we discuss Sochor's claim that the Supreme Court of Florida made unreasonable findings of fact when it denied his Brady and Giglio claims.

*A. Although the Supreme Court of Florida Unreasonably Applied Strickland, Sochor Cannot Establish Prejudice.*

Sochor argues that his trial counsel rendered ineffective assistance during the penalty phase by failing to investigate and present mitigating evidence and that the contrary ruling of the Supreme Court of Florida constitutes an unreasonable application of clearly established federal law. To obtain relief, Sochor must prove both that trial counsel's "performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003). Because the parties do not dispute that Sochor's trial counsel performed deficiently when he failed to investigate and present mental-health evidence during the penalty phase, we express no opinion about that issue. Our concern is whether Sochor suffered prejudice.

27

A determination of prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. We must ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In the context of a challenge to a sentence of death, the question is whether "there is a reasonable probability that [the judge and jury] would have returned with a different sentence." Wiggins, 539 U.S. at 536, 123 S. Ct. at 2543. "To assess that probability, we consider the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding–and reweig[h] it against the evidence in aggravation." Porter II, 558 U.S. at ----, 130 S. Ct. at 453–54 (alteration in original) (citation and internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." Harrington, --- S. Ct. at ----,131 S. Ct. at 792.

Sochor argues that the Supreme Court of Florida unreasonably applied the prejudice element of Strickland when the court "essentially boiled the issue down to the lower court believing either . . . [Dr. Greer and Dr. Froming] or the trial psychologist, Dr. Ceros-Livingston." Sochor argues that the prejudice analysis of

28

the Supreme Court of Florida is unreasonable because the court employed reasoning that the Supreme Court of the United States repudiated in Porter II. We agree.

As measured against the decision of the Supreme Court of the United States in Porter II, the Supreme Court of Florida unreasonably applied Strickland to decide the issue of prejudice in Sochor IV when it failed to consider or discounted entirely the mental health evidence that Sochor had presented in the postconviction evidentiary hearing. In Porter II, the Supreme Court of the United States ruled that the Supreme Court of Florida had unreasonably applied clearly established federal law in Porter I when it "either did not consider or unreasonably discounted the [mental health] mitigation evidence [that Porter] adduced in the postconviction hearing." 558 U.S. at ----, 130 S. Ct. at 454. The Supreme Court of the United States ruled that it was unreasonable for the Supreme Court of Florida to "discount entirely" the impact that the testimony of Porter's neuropsychologist might have had on the sentencing judge and jury based on the fact that the experts offered by the state disagreed with the conclusions of Porter's expert. Id. at 455. As the Supreme Court of the United States explained, "[w]hile the state's experts identified perceived problems with the tests that [Porter's neuropsychologist] used and the conclusions he drew from them, it was not reasonable to discount entirely

29

the effect that this testimony might have had on the jury or the sentencing judge." Id. The Supreme Court of the United States also ruled that it was unreasonable for the Supreme Court of Florida to fail to give "any consideration for the purpose of nonstatutory mitigation to [the testimony of Porter's neuropsychologist] because "[u]nder Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating." Id. (citing Hoskins v. State, 965 So. 2d 1, 17–18 (Fla. 2007)). As the Supreme Court of the United States explained, "the Constitution requires that 'the sentencer in capital cases must be permitted to consider any relevant mitigating factor.'" Id. (quoting Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S. Ct. 869, 875 (1982)).

The expert testimony of Dr. Greer and Dr. Froming that Sochor introduced at the evidentiary hearing was relevant mitigating evidence. The circuit court qualified both Dr. Greer and Dr. Froming as experts and admitted their testimony that additional mental health evidence was available at the time of Sochor's 1986 trial. For example, Dr. Greer testified that in his medical opinion, "manic depressive illness" was "present [in Sochor] at the time of the murder." Dr. Greer explained that manic depressive illness is a "chronic," lifelong disorder. Dr. Greer based this opinion on his "own diagnos[is]," and he stated that the description of

30

Sochor in prison records that he reviewed "support[ed] [his] diagnos[is]." Dr. Froming testified that the injuries that Sochor suffered as a child and a young man could have caused an injury to Sochor's brain and that Sochor's extensive alcohol consumption increased his risk of organic brain damage.

After the Supreme Court of Florida ruled that Sochor's lawyer rendered deficient performance by failing to present relevant mental health mitigation evidence, it was required to weigh the additional mitigating mental health evidence that could have been presented at the trial and the mitigating evidence that was presented at trial against the aggravating evidence to decide whether Sochor suffered prejudice. Williams v. Taylor, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000). Although Dr. Ceros-Livingston "identified perceived problems with the . . . conclusions," Porter II, 558 U.S. at ----, 130 S. Ct. at 455, of Dr. Greer and Dr. Froming, the Supreme Court of Florida could not reasonably rely on the alleged problems identified by Dr. Ceros-Livingston to "discount entirely the effect that" the testimony of Dr. Greer and Dr. Froming "might have had on the jury or the sentencing judge," id. Instead of refusing to consider or entirely discounting the mitigating evidence that could have been presented at the trial, the Supreme Court of Florida should have determined what impact, if any, that mitigating evidence and the mitigating evidence that was presented at sentencing would have had on

31

the trial court when weighed against the aggravating evidence. The Supreme Court of Florida unreasonably applied clearly established federal law when it "either did not consider or unreasonably discounted" the relevant mental health evidence that Sochor produced in the evidentiary hearing.

But our inquiry does not end here. "[I]f a state habeas court denies relief where we would have done so if we were conducting de novo review, federal relief is due to be denied regardless of the reasoning the state court used to reach that result." Jefferson v. Fountain, 382 F.3d 1286, 1295 n. 5 (11th Cir. 2004). We must independently decide whether the failure of Sochor's lawyer to investigate and present additional mitigating evidence at the sentencing proceeding prejudiced Sochor.

"[T]his is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." Suggs v. McNeil, 609 F.3d 1218, 1232 (11th Cir. 2010) (internal quotation marks omitted). After the jury recommended a sentence of death, the trial court found that the prosecution proved numerous valid statutory aggravating circumstances beyond a reasonable doubt, and the aggravating evidence carried great weight. Based on the evidence that Sochor choked Patty to death with his bare hands and that strangulation is a slow and painful death, the trial court found that the murder was especially heinous,

atrocious, and cruel. The Supreme Court of Florida has stated that the heinous, atrocious, and cruel aggravator "is among the weightiest . . . in the statutory scheme." Rigterink v. State, 66 So. 3d 866, 900 (Fla. 2011). Likewise, "the prior violent felony aggravator is considered one of the weightiest aggravators." Silvia v. State, 60 So. 3d 959, 974 (Fla. 2011). Sochor's prior violent felony was the vicious sexual assault that he committed after he abducted a nineteen-year old girl from the parking lot of a bar and choked her. That evidence would have been significant at Sochor's sentencing in the light of the similarities between the two crimes, and the trial court would have assigned great weight to this aggravator. The trial court also would likely have assigned great weight to the fact that the murder was committed in the course of a kidnapping. "Many death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping." Jackson v. Herring, 42 F.3d 1350, 1369 (11th Cir. 1995); see also Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." Dobbs, 142 F.3d at 1390.

When all the relevant evidence is weighed, the aggravating evidence outweighs the mitigating evidence. There is not a reasonable probability that the

33

trial court would have rendered a sentence other than death based on the testimony that Sochor produced at the evidentiary hearing. See Wiggins, 539 U.S. at 536, 123 S. Ct. at 2543. The deficient performance of Sochor's counsel did not prejudice him.

Dr. Greer and Dr. Froming both testified that Sochor's capacity to conform his conduct to the requirements of the law was substantially impaired when the offense occurred and that he then suffered from extreme mental and emotional disturbance, but at his trial Sochor presented a similar theory that the judge and jury rejected. Both Dr. Greer and Dr. Froming diagnosed Sochor with manic depression, and Dr. Froming diagnosed Sochor with organic brain damage. The thrust of the testimony of both Dr. Greer and Dr. Froming was that Sochor's mental health problems were exacerbated by the alcohol that he consumed the night he murdered Patty. Dr. Greer stated that "synergistic effect" of Sochor's alcohol consumption on his manic depression was enhanced on the night of the murder because he had abstained from alcohol for a long period of time before that night. Dr. Froming testified that because Sochor had abstained from alcohol before the night of the murder, a small number of alcoholic drinks could have caused him to become acutely intoxicated and black out such that Sochor's "impulse control would have been substantially reduced . . . to the point of nonexistence." But

34

neither Dr. Greer nor Dr. Froming testified that Sochor's manic depression or brain damage drove him to drink on the night of the murder. We have recognized that a jury can react "hostilely to an assertion that a person should in some way be excused from the consequences of his acts because he had voluntarily taken drugs," Rogers v. Zant, 13 F.3d 384, 387 (11th Cir. 1994), and the same goes for alcohol.

Dr. Zager presented a substantially similar theory to the jury during the trial. Dr. Zager testified that Sochor suffered from "anti-social personality disorder," and that Sochor was "a much more aggressive, potentially very violent, individual under the influence of intoxicants." Dr. Zager believed that Sochor acted impulsively and with impaired judgment while under the influence of alcohol.

The sentencing judge and jury rejected a theory that Sochor did not deserve a sentence of death because alcohol exacerbated a psychological disorder, and Sochor fails to explain why the judge and jury would have been any more likely to accept such a theory when the underlying mental health issue was manic depression instead of antisocial personality disorder. The difference is negligible.

Most of the nonstatutory mitigating evidence that Sochor produced in the evidentiary hearing was cumulative of evidence produced at the guilt and penalty phases of the trial. Sochor argues that he "presented evidence of the nonstatutory mitigator of childhood trauma at the postconviction hearing." Although Sochor

presented evidence during the evidentiary hearing that he suffered severe beatings and head injuries as a child and young adult, our review of the record establishes that the sentencing judge and jury heard substantially similar evidence during the penalty phase. For example, Sochor's sister testified during the penalty phase that Sochor's father, Charles, once "got ahold of [Sochor's] hair, and he kept banging his head against the wall." Charles testified during the penalty phase that when he returned home from work once, Sochor's mother, Rose, told Charles that "she had lost her temper and beat [Sochor], then banged his head against the wall." Charles also testified at trial that when Sochor was four-years old, Sochor fell as he ran with a tin horn in his mouth. Charles testified that the tin horn went through the roof of Sochor's mouth and "open[ed] a hole that you could see right into his head." During the evidentiary hearing, Sochor's siblings testified that their father had brutally beaten Sochor when he was a child. One of Sochor's friends testified during the evidentiary hearing that Sochor once got into a fight with a much larger man and that the man picked Sochor up, threw him to the ground, and slammed his head into the pavement. The jury heard evidence at trial regarding childhood trauma that was substantially similar to the evidence Sochor presented at the evidentiary hearing. "Obviously, a petitioner cannot satisfy the prejudice prong of

the <u>Strickland</u> test with evidence that is merely cumulative of evidence already presented at trial." <u>Rose v. McNeil</u>, 634 F.3d 1224, 1243 (11th Cir. 2011).

Although Sochor argues that he "presented lay witness testimony at the postconviction evidentiary hearing about his positive character traits that the jury never heard," that evidence too was cumulative. Sochor maintains that he presented evidence in the evidentiary hearing that he "was known for protecting his siblings, and his friends, and that he was a loving son and brother," but substantially similar testimony was presented to the judge and jury by most of Sochor's family members who testified during Sochor's sentencing.

Sochor argues that he produced at the evidentiary hearing new evidence that he abused alcohol and drugs, but that evidence posed a danger to Sochor. For example, one of Sochor's friends testified that he and Sochor "dropped acid" more than one hundred and fifty times in 1971. There is every reason to believe that this evidence would have hurt Sochor as much as it would have helped him. "As we have repeatedly recognized, evidence of drug and alcohol use is often a 'two-edged sword,' that provides an independent basis for moral judgment by the jury." <u>Suggs</u>, 609 F.3d at 1231 (internal quotation marks and citations omitted). <u>See also</u> <u>Pace v. McNeil</u>, 556 F.3d 1211, 1224 (11th Cir. 2009) ("[P]resenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing

a mitigating factor, such details many alienate the jury and offer little reason to lessen the sentence."); Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001) ("[E]mphasizing [petitioner's] alcoholic youth and intoxication may also have been damaging to [petitioner] in the eyes of the jury."); Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing."); Rogers, 13 F.3d at 388 ("Counsel could have reasonably believed that developing [petitioner's] drug use as a defense would have . . . been perceived by the jury as aggravating instead of mitigating.").

Sochor argues that the jury "should have heard evidence and considered the nonstatutory mitigator of poverty," but this evidence too was fraught with peril. During the evidentiary hearing, Blaine Sochor, one of Sochor's brothers, testified that he and his siblings would sometimes be so hungry as children that they would hunt for food. Blaine also testified that he suffered from boils on his legs as a child and he attributed this condition to malnutrition. Although Blaine testified that he suffered poverty and hunger during childhood, he did not become a rapist and murderer as an adult. When "additional mitigating evidence emphasizing physical abuse, neglect, and poverty" has the potential to highlight that a petitioner's sibling "grew up in the same environment" and "still emerged as a successfully employed,

38

law-abiding citizen," that evidence can pose as much harm as good. Boyd v. Allen, 592 F.3d 1274, 1301 (11th Cir. 2010).

When we "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation," Porter II , 558 U.S. at ----, 130 S. Ct. at 453–54 (quoting Williams, 529 U.S. at 397–98, 120 S. Ct. at 1515), we conclude that Sochor has not established a reasonable probability that he was prejudiced by his lawyer's failure to present at sentencing the evidence Sochor produced at his postconviction evidentiary hearing. On de novo review, Sochor's claim of ineffective assistance fails.

*B. Sochor's Brady and Giglio Claims Fail.*

With respect to his claims that Florida violated his right to due process by failing to disclose an offer of immunity to his brother, see Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and eliciting his false testimony, see Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972), Sochor failed to satisfy his burden of rebutting, by clear and convincing evidence, the contrary factual determinations of the Supreme Court of Florida. 28 U.S.C. § 2254(e)(1). That court found that Florida never offered Sochor's brother immunity nor elicited his false testimony. We address each of these claims in turn.

39

Sochor argues that the denial of his claim that the state violated his right to due process under Brady when it allegedly failed to disclose that Gary Sochor received immunity in exchange for his trial testimony was based on an unreasonable determination of the facts, but this argument fails. Gary testified at the evidentiary hearing that the police officer who escorted him into the courtroom told him that he had been given immunity, but Gary, in response to questioning from Sochor's counsel, also testified that he never thought the police viewed him as a suspect. Kelly Hancock, the prosecutor at Sochor's trial, testified that he never offered Gary Sochor immunity and that police officers in Florida do not have the power to grant witnesses immunity. Relying on the credibility determinations of the trial court, the Supreme Court of Florida rejected Gary's version of events and concluded that the state did not offer him immunity in exchange for his testimony. The trial court found Gary Sochor's evidentiary testimony to be "unreliable and not credible." The trial court found Hancock's testimony to be "candid, trustworthy, and credible." The Supreme Court of Florida ruled that the finding of the trial court "that the State did not give Gary Sochor immunity in exchange for his testimony is supported by competent, substantial evidence."

Sochor presents no clear and convincing evidence that this factual determination is unreasonable. Sochor argues that the finding of the Supreme

Court of Florida that the state did not offer Gary immunity is unreasonable because "[n]o rebuttal from any police officer was presented." This argument is irrelevant because Sochor did not present any evidence that the police had the power to immunize witnesses on behalf of the district attorney, and Hancock testified that "police officers [did] not have the power to grant witnesses immunity." Sochor also argues that "Hancock's testimony does not rebut [Gary's testimony], contrary to the . . . finding" of the Supreme Court of Florida because Hancock admitted on re-cross examination that "as to immunity I think that what [the police] would do, they might talk to a witness and say, [we'll] grant you immunity but we have to go to the State and get the State to do it. That's what would generally happen." But Hancock testified that the police did not have the power to provide witnesses immunity. Sochor presented no evidence to rebut this testimony. Regardless of whether a police officer told Gary that he would be granted immunity for his testimony, Gary could not have been granted immunity because police officers had no authority to do so.

Sochor also argues that the denial of his claim that the state violated his right to due process under Giglio when it allegedly failed to correct Gary's testimony that he had not received immunity and allegedly instructed Gary to lie about kissing Patty was based on an unreasonable determination of the facts, but this

41

argument too lacks merit. In addition to testifying that a police officer granted him immunity before the trial, Gary also testified at the evidentiary hearing that Hancock told him not to mention in his testimony that he kissed and fondled Patty on the night of the murder. Hancock, on the other hand, testified that Gary never told him that he had kissed and fondled Patty on the night of the murder. At trial, Gary testified that no one told him what to say during his testimony, and that Hancock had told him to tell the truth. Sochor argues that the "Supreme Court of Florida's deference to the [trial] court's" finding that the state did not instruct Gary to lie about kissing Patty "cannot be reconciled with its conclusion that there is no reasonable probability that the result of the trial would have different," but this argument fails. As the Supreme Court of Florida explained, the only evidence suggesting that Hancock told Gary to lie was Gary's evidentiary hearing testimony, but that testimony was contradicted by Hancock's evidentiary testimony and by Gary's testimony during the trial. Sochor fails to offer clear and convincing evidence that the factual finding of the Supreme Court of Florida is unreasonable. Sochor's lone argument is that "the fact that Gary Sochor had kissed [Patty] in the car was in Gary Sochor's deposition taken by" Sochor's trial counsel. "Clear and convincing evidence entails proof that a claim is 'highly probable,' a standard requiring more than a preponderance of the evidence but less than proof beyond a

reasonable doubt." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1309 (11th Cir. 2012) (citation omitted). That Gary told Sochor's trial counsel that he kissed Patty does not make it highly probable that Hancock instructed Gary to lie to the jury about a kiss.

## IV. CONCLUSION

The denial of Sochor's petition for a writ of habeas corpus is **AFFIRMED**.